HAZZLE PAULINE RAY, EMPLOYEE v.
SHELNUTT NURSING HOME, EMPLOYER, ET AL

5-4863                             439 S.W. 2d 41

Opinion Delivered April 7, 1969

*McMath, Leatherman, Woods & Youngdahl* and *Silas H. Brewer, Jr.,* for appellant.

*Terral, Rawlings, Matthews & Purtle* for appellees.

J. FRED JONES, Justice.    This is a workmen's compensation case and the extent of permanent partial disability to the body as a whole is the question involved.

The facts very briefly are these:    On November 24, 1965, Mrs. Pauline Ray injured her back while in the course of her employment as a practical nurse by the Shelnutt Nursing Home.    The injury occurred when Mrs. Ray fell partially to the floor while attempting to assist an aged patient into a wheel chair.    The injury resulted in the surgical removal of an intervertebral disc at the lumbosacral angle followed by a spinal fusion from the fifth lumbar vertebra to the sacrum on December 21, 1965.    Mrs. Ray was paid compensation benefits for temporary total disability from the date of her injury until the end of her healing period on March 3, 1967.    The claim before the Workmen's Compensation Commission was for a determination of the extent or percentage of permanent partial disability.

The employer and its compensation insurance carrier controverted the claim for any permanent partial disability in excess of 20%.    The Commission awarded 40% permanent partial disability to the body as a whole and the employer and compensation insurance carrier appealed to the Saline County Circuit Court. The circuit judge held that there was no substantial evidence to sus-

tain the Commission in awarding more than 20% permanent partial disability and Mrs. Ray brings this appeal, relying upon the following point for reversal:

"There is substantial evidence to support the award of the Workmen's Compensation Commission, and the Circuit Court therefore erred in modifying that award."

We agree with the circuit court that there was no substantial evidence to sustain the Commission's award of more than 20%.

We recognize the controlling legal standards expressed by this court in all the cases cited by the appellant. We recognize that evidence in a compensation case should be given its strongest probative force in favor of the action of the Commission. We recognize the responsibility of the Commission in drawing inferences from testimony open to more than a single interpretation. We recognize that the determination of the percentage of permanent disability in a workmen's compensation case is a function of the Commission not to be disturbed on appeal if supported by substantial evidence, and we also recognize that the degree of disability suffered by an injured employee is a factual question to be determined by the Commission as stated in *Caddo Quicksilver Corporation* v. *Barber,* 204 Ark. 985, 166 S.W. 2d 1, cited by the appellant.

The appellant cites the cases of *Glass* v. *Edens,* 233 Ark. 786, 346 S.W. 2d 685, and *Wilson & Company, Inc.* v. *Christman,* 244 Ark. 132, 424 S.W. 2d 863, in support of her contention, but those cases are clearly distinguishable from the case at bar.

The appellant argues in her brief that "the landmark decision in *Glass* v. *Edens* . . .firmly established the doctrine that the Commission must consider numerous factors, in addition to functional or anatomical impairment in determining an injured workmen's permanent

partial disability." If such doctrine was firmly established in *Edens,* it only applies when such additional factors pertain to disability and are presented to the Commission by competent evidence.

In the *Edens* case the Full Commission affirmed a referee's finding of a 40% permanent partial disability to the body as a whole based entirely on a medical rating of 40% under the erroneous assumption by the referee, that he was dealing only with scheduled injury and was limited to the consideration of medical evidence only under a former decision of the Full Commission. The referee in the *Edens* case said:

" 'In the case of *Jesse A. DeBin* v. *Kaiser Engineers,* reported Vol. 214, page 3 of the Opinions of the Full Commission, the Commission held that evidence other than clinical findings cannot be considered to arrive at a rating for permanent partial disability. I must therefore *only consider* the medical rating of disability.' " (Emphasis supplied.)

In remanding the *Edens* case for further consideration, this court said:

"...Ark. Stats., § 81-1313 (d), provides:

'A permanent partial disability not scheduled in subsection (c) hereof shall be apportioned to the body as a whole, which shall have a value of 450 weeks, and there shall be paid compensation to the injured employee for the proportionate loss of use of the body as a whole resulting from the injury.'

Appellees contend that this amended section of the Workmen's Compensation Act makes all injuries scheduled injuries and that an injured employee should only be paid for functional loss of use of his body.

We feel the Legislature's use of the term 'loss of use of the body as a whole' in Ark. Stats., § 81-

1313 (d), when read in the light of other sections of the Workmen's Compensation Law, which are not in conflict therewith, does not mean merely functional disability but includes, in varying degrees in each instance, loss of use of the body to earn substantial wages."

There is nothing startling or so unusual about the decision of this court in the *Edens* case that marks it as a "landmark decision." That decision would have *really* been a landmark decision had we agreed with the referee, and held that evidence other than clinical findings could not be considered in determining the extent of permanent partial disability and that only the medical rating of functional disability could be considered for that purpose. If such had been our holding, we would have eliminated the need for a referee or a Commission in determining extent of permanent partial disability. While in so holding we would have greatly lightened our own task in determining the substantial nature of evidence submitted in a permanent disability case, we would have practically repealed the "other sections of the Workmen's Compensation Law," referred to in the *Edens* decision, including the statutory definition of disability. Only one disability, in all its degrees as to partial, total, temporary and permanent, is defined in Ark. Stat. Ann. § 81-1302 (e) (Repl. 1960) as follows:

" 'Disability' means incapacity because of injury to earn, in the same or any other employment, the wages which the employee was receiving at the time of the injury."

Our decision in the *Edens* case did not establish the doctrine that the Commission *must consider* numerous factors in addition to functional or anatomical impairment, in determining an injured workmen's permanent partial disability. We did not say in that case that the Commission *must* do anything. What we did say was that the Commission is not confined, in its consideration, to clinical proof or medical evidence alone, in

arriving at the extent of permanent disability suffered by an injured employee under the Workmen's Compensation Law. In *Edens* we simply held, in effect, that the legislature had not placed the Commission in a medical strait jacket in determining disability as defined in the act, permanent or otherwise.

We did not know then, and we do not know now, what substantial evidence, other than the medical evidence, was before the Commission and available for its consideration in the *Edens* case. If there was other evidence before the Commission, it erroneously failed to consider it. The purpose in sending that case back to the Commission was for consideration of such other evidence as may have been before the Commission in that case, but which the Commission concluded it had no right to consider. The substantial nature of the evidence other than medical, marks the distinction between *Wilson & Company, Inc.* v. *Christman, supra,* and the case at bar.

In the *Christman* case, Christman sustained a similar injury and had a similar education as the appellant in the case at bar. In that case 30% permanent partial disability was the highest amount by medical evidence and we affirmed the Commission's award of 60%. Two of Christman's former employers, for whom he had performed his lightest tasks, testified that they would not re-employ him on the basis of the medical reports. Aside from Christman's own testimony as to his constant pain, the medical evidence, with emphasis supplied, was as follows:

Dr. Tom P. Cocker: "I do not believe that there is likelihood of further improvement as far as the back is concerned although the patient should continue on exercises in that hope.

I do not think that he will be able to return to *manual type work or anything that requires repeated bending, stooping, lifting or prolonged*

*standing or walking.* It is my opinion that the patient has a permanent partial disability to his body as a whole of 25%."

Dr. William G. Lockhart, a neurosurgeon of the Holt-Krock Clinic in Fort Smith, who performed the surgery on Christman, reported as follows:

"As stated in previous correspondence, I feel that we cannot, on any means, classify this boy with anything but *a poor result from surgery.*

Once we get through the emotional and psycho-genic overlay here, I think that we *would be just-ified in suggesting* a permanent partial disability of the body as a whole of 25% to 30%.

I do not feel that this boy is going to be able to go back to an employment that he has enjoyed before such as manual exertions of lifting or bend-ing over postures.

I do believe that he is employable in such work as bench work, in which he might be re-trained in. If he was able to get back into an employable situa-tion, regardless of its nature, I am sure that this would help reduce some of his anxiety and emotion-al overlay.

\* \* \*

Several days ago, 6/20/66, he appeared in my office accompanied by his wife stating that he had total paralysis of the right lower extremity that had come on spontaneously.

\* \* \* It was obvious, when he was examined in the office, that *we were dealing with either a hys-terical paralysis* or malingering.

\* \* \*

I feel that I have done as much as I can do with this man at the present time. They seemingly do not wish to accept the fact that *this could be a hysterical problem* and certainly his wife does not even like to consider the fact that there may be a question of malingering here also. It is obvious that we are not dealing with that degree of physical disease at the present time that would cause the magnitude of problems, or for that matter what *physical disease is present is so far over-shadowed by these other factors that it is impossible to treat this man intelligently* without thorough psychiatric evaluation and treatment." (Emphasis supplied.)

In the *Christman* case we quoted from Larson's Workmen's Compensation Law, § 42.22, as follows:

" ... [W]hen there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or *hysterical paralysis,* it is now uniformly held that the full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurotic, psychotic, depressive, or hysterical symptom or personality disorder have accepted this rule." (Emphasis supplied.)

We also pointed out in the *Christman* case "there is evidence in the record that appellee suffered poor eyesight as an additional handicap to some types of employment."

Now turning to the case at bar, the members of the Full Commission examined the record for the preponderance of the evidence whereas, this court, as well as a circuit court on appeal, must examine the record for substantial evidence to support the finding of the Commission.

The referee, who heard the witnesses and observed their demeanor while testifying, summed up his impression of the appellant in the following language:

"The claimant is a young woman who has proven herself to be adaptable in that she has learned the nursing profession as well as having been a saleslady and floor walker and an employee of a furniture company. The claimant impressed the Referee as being an articulate and knowledgeable lady, and the fact that she is only 39 years of age makes her a good candidate for rehabilitation."

There is nothing in the record to refute the referee's impression of the appellant, and therein lies part of the distinction between the case before us and the *Christman* case. Hysterical paralysis and partial blindness, as was evident in the *Christman* case, were not even suggested in the case at bar, and appellant agreed in oral argument that traumatic neurosis is not contended as a contributing factor.

On direct examination the appellant gave her work history prior to her injury, but gave no testimony as to work history, attempts to work, or ability or inability to work since her injury and surgery. On cross-examination the appellant testified as follows:

"Q. Have you done any work since November 24, 1965 at all, anywhere?

A. No, sir.

Q. Have you done any work that you didn't get paid for?

A. No, sir.

Q. Have you tried to get a job anywhere?

A. No, sir.

Q. Have you registered with the employment office?

A. No, sir.

Q.  Or gone to any places of business—

A.  No, sir.

Q.  —to see if they have any type of work? What hobbies do you have?

A.  Reading, watching television.

Q.  Are you still able to do that?

A.  Yes, sir, I have to lay down an awful lot so that passes the time for me.

Q.  All right. Do you drive a car?

A.  On occasion, yes, sir.

Q.  Have you been driving a car since your injury on November 24, 1965?

A.  Yes, sir."

Appellant testified as to what the doctors had told her relative to the work she could do and what she should avoid, and she testified as to the types of work she had done prior to her injury. She offered no testimony at all, of a substantial nature, pertaining to her ability to earn in the same or other employment, the wages she was receiving at the time of her injury.

Dr. McKenzie, one of the orthopedic surgeons who performed appellant's spinal fusion, testified as follows:

"Q.  Now I'll ask you if you had occasion to see her and make another report on March 3rd?

A.  Yes, sir.

Q.  I'll ask you if the patient was dismissed at that time with a disability rating?

A. At that time she said she was having some pain, but this wasn't too much. Then that she had diffuse tenderness; that there was no muscle guarding at this time. There was some restriction in the motion of the spine. The x-rays, including the bending films, revealed that the fusion was radiographically solid and at that time we felt that she could return to work which did not require heavy lifting. And as a matter of fact, I think we sent a copy of this information, at this time, to the rehabilitation people so that they could make a contract with her to maybe start trying to train her in some activity which did not require heavy lifting, and she was dismissed at that time with 15 per cent permanent disability.

Q. Is it your opinion, based upon reasonable medical information that this is the disability this woman has?

A. Yes.

Q. Now with reference to work that she could not do heavy lifting, could you tell us what type of work that she might be able to do?

A. I think she could perform activities, most any activity which required use of her upper extremities. Activities in which a person is allowed to change position infrequently [sic] from a sitting to a standing position, or some type of work that she can get up and move about, providing she didn't have to manipulate patients she could resume nursing, particularly as a medication nurse, or working in allied areas which the lifting was not required because this would allow her to change—

Q. Dr. McKenzie, the lady has testified that she has done work I believe as a floor lady and as

a clerk in TG&Y store, which if I'm correct is a dime store—

A. Uh-huh.

Q. —or something of that—Do you think she'd be able to do clerical work in a dime store or department store or something of that nature or be a floor lady?

A. Well, I don't know what a floor lady is. I think that she might have difficulty. Some of the dime stores require when a girl is on the floor that they start standing until they sit down which would be—It is a pretty good chore for anybody and she would have difficulty doing that.

Q. If this floor lady is kind of a supervisory job where she could sit down sometimes and stand up part of the time, do you think she could do that?

A. I think so."

Dr. McKenzie re-examined appellant in October 1967, and as to this examination, he testified as follows:

"Q. I believe at this time you stated 15 to 20 per cent, not to exceed 20 per cent and this would include anticipated changes that may occur following this sort of procedure. Is that correct?

A. Yes, sir.

Q. Anticipating the things that might happen to her why it was still in that range of 15 to 20 percent?

A. (Nods affirmatively).
* * *

Q. I believe you mentioned that such things as diminished sensation or reflexes in the lower extremities and the sciatic notch tenderness would not, in and of themselves suggest disability, but I believe you used the term 'physical impairment.' Would you outline what impairment is involved? What you meant by impairment if you recall that portion of your testimony or if I'm stating it correctly?

A. Well, a physical impairment is—it's an impairment of her physical ability to perform the normal activities that the body was designed for.

Q. Such as what? Walking?

A. Walking, sitting, holding it together—I mean there are just numerous functions. Now then her impairment is that in her particular situation that she's got a fused lumbosacral joint which in turn takes away a little bit of the motion of the lumbar spine. The lumbosacral joint normally has less motion than the other lumbar joints and so the amount of lost motion insofar as that joint is concerned is decreased. The fact that her ankle jerk in itself is not perfect is not an impairment. It is a sign that there is some disturbance in the reflex arc but we will see some people who normally at times will not show a reflex at all and they've never had anything wrong with them. So, I mean this is not a valid criterion for impairment and she has shown on up until later in her course that she has some atrophy of her right calf compared to left and this is a good objective finding that there has been impairment of the nerve function to the leg. Now this has come back within an eighth of an inch which means that *so far as function is concerned there is very*

*little functional impairment,* in that sense.''
(Emphasis supplied.)

Dr. R. H. Whitehead, a specialist in psychiatry, testified as to neurotic overlay in appellant's condition upon his one examination. His testimony was not considered by the referee and it was stated in oral argument in answer to specific questions, that no claim was made for traumatic neurosis.

Several medical reports were accepted in evidence, but they were all progress reports and contribute nothing of a substantial nature to the evidence relative to permanent disability. Dr. Horace Murphy, an orthopedic surgeon, examined the appellant and although his x-ray examination failed to reveal the fusion between the fifth lumbar vertebra and the sacrum, his testimony on permanent partial disability is as follows:

"Q. After that examination, did you conclude that the woman had any permanent disability and, if so, how much?

A. In my report of May 23rd, I felt as though the patient had twenty per cent disability as related to the body as a whole.

Q. Dr. Murphy, is that rating addressed to the amount of permanent, physical impairment she has? Does it include anything other than physical impairment? This figure, this twenty per cent that you just mentioned.

A. The figure is the disability which is associated with the patient's having restriction of motion, having had a disc operation, presumably, at the L-5, S-1 level; and absent ankle jerk; limited bilateral straight leg raising. These are the physical impairments which I think dictate this extent of disability.

Q. Mrs. Ray, as you know, was at the time she was injured a practical nurse, and her duties in-

volved a certain amount of lifting and the supporting of elderly patients in the nursing home where she worked. In your opinion, on the occasion of your last examination of Mrs. Ray, could she return to those duties with the expectation that she could perform them successfully?

A. All I can say is that by the examination which I conducted of Mrs. Ray, with the stiffness in her back and her inability to bend, associated with the discomfort of straight leg raising, I don't think she could do this type of work which, from my own patients, whom I have examined, have told me that it is a difficult job."

On cross-examination, Dr. Murphy testified as follows:

"Q. Dr. Murphy, along that line, of course, as a practical nurse doing the type of work she would be required to do in lifting patients, would it be fair to say that that would be classified as heavy lifting?

A. I think it really is, yes.

Q. But, by the same token, there would be certain employment in her condition and with the disability rating which she had which she would be able to perform.

A. Yes. Let me see if I can clarify this. There are various functions involved. For example, a woman who is going to, perhaps, sit at a desk and do certain paper work which is necessary, who is going to bring water to the patients, or who is going to give them their baths—this type of thing, I think she could do. Now, conversely, if she is required to lift the patient to the

standing position and then sit him on the bedroom commode; if she is supposed to put him in his wheel chair; these are a strain on a good back and this she cannot do.

Q. Let me ask you this. Here is a statement that Dr. McKenzie made at the hearing with reference to what we are talking about, and this was his answer:

'I think she could perform activities, most any activities which requires use of her upper extremities, activities in which a person is allowed to change position frequently—' they've got 'infrequently' but I think they meant 'frequently'—'from a sitting to a standing position or some type of work that she can get up and move about, providing she didn't have to manipulate patients, she could resume nursing, particularly as a medications nurse or working in allied areas in which the lifting was not required, because this would allow her to change.'

A. I think we have said almost identically the same thing.

Q. Both of you have said the same thing.

A. Yes, both of us have said the same thing."

Dr. Murphy sums up as follows:

"Q. Now that you have all of the information that Mr. Rawlings has so comprehensively developed, are any of your opinions and conclusions as to the extent of this woman's permanent physical impairment in the activities in which she can now engage, that is those opinions and conclusions which you expressed earlier today, are they changed in any way or altered?

A. No. I have simply evaluated this patient on the basis of what I saw in her—the stiffness in the back, the change in the reflexes and sensation, and the effect of straight leg raising on her back—and I have stated before and outlined what I thought she could and couldn't do; and I still think her disability is as reported, twenty per cent of the body as a whole.

Q. But, medically, if she fell in 1963 and had been having back trouble since 1956, and if she fell again around June of '66, medically you couldn't divide it up and say how much of this twenty per cent is attributable to one thing—to the fall in '63, or the back trouble in '56—could you, Doctor?

A. I don't think Solomon could, so far as that is concerned. All I say is that when I saw her and examined her, what I saw was a woman twenty per cent disabled.''

The appellee earnestly contends that a substantial portion of such residual disability as appellant does have, is a result of disease and accidental injuries suffered and sustained by the appellant prior and subsequent to the injury sustained in the course of her employment by the appellee. Dr. Murphy answers that argument with the observation that even Solomon could not differentiate one from the other.

The record indicates that the appellant was doing her work in a satisfactory manner while employed by the appellee prior to her injury. As to prior injury resulting in noncompensated disability, industry takes an employee as is. Regardless of other falls or injuries subsequent to surgery in this case, the defective disc was removed by surgery, the defective disc space was spanned by surgical fusion and the fusion was found to be solid upon final examination and discharge by the at-

tending physicians. One disc and one fusion were all that was involved in this case.

There is considerable controversy between the parties in this case as to whether the medical testimony pertaining to a 20% permanent partial disability relates to functional disability consisting only of physical limitation in the normal functional use of the body, or whether the doctors considered, and were also talking about, the statutory definition of disability pertaining to loss in ability to earn in the same or other employment the amount of wages the appellant was receiving at the time of her injury.

Be that as it may, the medical evidence was the only evidence the referee or the Commission had to go on in arriving at their conclusions in this case. We recognize, as we did in *Wilson & Co.* v. *Christman, supra,* that the Commission is in a better position than is the doctor, to evaluate a claimant's ability to earn in the same or other employment the same wages received at the time of injury. When the Commission once has before it firm medical evidence of physical impairment and functional limitations within the peculiar knowledge and specialty of the examining physician, the Commission then has the advantage of its own superior knowledge of industrial demands, limitations, and requirements, in weighing the medical evidence of functional limitations together with *any other evidence* of how the functional disability will affect the ability of the injured employee to obtain or hold a job and thereby arrive at a reasonably accurate conclusion as to the extent of permanent partial disability as related to the body as a whole. As an example, in the case at bar, Dr. McKenzie testified ''well I don't know what a floor lady is.''

The Commission's knowledge and experience, however, is not evidence, and the Commission can only apply its own knowledge and experience of industrial requirements as a jury might do in weighing all the competent evidence pertaining to handicaps suffered by each in-

dividual claimant as a result of compensable injury, in arriving at the amount or percentage of overall permanent disability that individual has suffered as a result of the injury.

There is substantial evidence in the record before us, that the appellant's physical condition was still improving when last examined by the doctors, and there is nothing in the record to contradict the referee's finding that the appellant was a good candidate for rehabilitation. Regardless of whether the 20% permanent partial disability established by the medical evidence pertained to loss of physical function, or pertained to the appellant's loss in wage earning capacity, there is no substantial evidence in the record that appellant's permanent partial disability exceeds the 20% estimate contained in the medical evidence. The evidence of permanent partial disability in this case, aside from medical evidence on limitation of motion, boils down to appellant's own testimony that she has to lie down a lot, and the doctors' testimony that she cannot lift heavy objects in general and bed ridden or elderly rest home or hospital patients in particular.

While it is true that over $7,000.00 was spent in medical treatments for the appellant while she was receiving less than $2,000.00 in compensation payments, the amount and duration of compensation payments are limited by statute and medical expenses are not. Unless we could say as a matter of law, that in any industrial injury case a permanent loss in ability to earn must always follow, and exceed at least in some degree, the permanent loss in the functional use of the body as a whole, we must hold under the evidence in the case before us, that the judgment of the trial court must be affirmed. We are unable to announce such rule of law, so the judgment of the circuit court is affirmed.

Affirmed.