OUACHITA MARINE & INDUSTRIAL CORPORATION ET AL V. CARMINE M. MORRISON

5-4879                                             440 S.W. 2d 216

Opinion Delivered May 12, 1969

*Bridges, Young, Matthews & Davis* by *Bill R. Holland* for appellants.

*Jerry Thomason* for appellee.

GEORGE ROSE SMITH, Justice.    This is a workmen's compensation proceeding involving a work-connected injury that was ultimately diagnosed as a ruptured lumbar disc.    When the case was heard by the referee the claimant's injury had healed to the greatest extent that the attending physicians thought to be possible without surgery.    Morrison, the claimant, refused to submit to an operation.    The commission made an award of a 60% permanent partial disability, which was affirmed by the circuit court.

On appeal the question is one of first impression in Arkansas:    Under our statute does the workmen's compensation commission have discretionary authority in making an award of benefits to a claimant who refuses to undergo surgery?    That question turns upon the correct interpretation of this language in our compensation law: "...where an injured person unreasonably refuses to submit to a surgical operation which has been

advised by at least two qualified physicians and where such recommended operation does not reasonably involve risk of life or additional serious physical impairment the Commission may, in fixing the amount of compensation, take into consideration such refusal to submit to the advised operation." Ark. Stat. Ann. § 81-1311 (Repl. 1960).

The claimant, a laborer, was 54 years old when his case was heard. He was using crutches at the time and testified that he was unable to return to work. Dr. Christian, an orthopedic surgeon, was similarly of the view that, *without surgery,* the claimant was totally disabled: "Since [the claimant] refuses surgical treatment and this is what I think he should have I have no alternative except to release him from care. He is, as of this time, totally disabled. I would anticipate with successful disc excision and spine fusion to have reduced his disability to partial permanent disability of an estimated 15 to 20% of the body as a whole." There was also medical testimony that the claimant's disability, without surgery, was 20% of his body as a whole.

We should stress at the outset that the medical testimony had reference only to functional physical disability and not to the economic disability that results from a workman's partial or total inability to earn a living. That distinction was explained in *Wilson & Co. v. Christian,* 244 Ark. 132, 424 S.W. 2d 863 (1968), in this language:

Thus, an injured employee who suffers a permanent partial loss of the use of his body is entitled to payment of compensation for the number of weeks the percentage of such loss bears to 450 weeks. This loss of use may consist of physical functional loss only, and its duration and extent may best be measured through physical examination by competent medical specialists. This permanent partial loss of use to the body may or may not also result in incapacity to earn the same wages received

at the time of injury. An accidental injury under this subsection may result in a permanent partial disability consisting only of a partial loss of use of the body as a whole and with no change in earning capacity at all. An injured employee is entitled to the payment of compensation, however, for *this loss of use* whether his earning capacity is diminished by the injury or not. *Dockery* v. *Thomas,* 229 Ark. 984, 320 S.W. 2d 257. Where the permanent partial disability consists also of an incapacity, because of the injury to earn wages as defined and set out in § 81-1302 (e), supra, such disability includes, blends in with, and is usually greater than the disability occasioned by loss of functional use only.

In the case at bar the commission's problem was that of fixing the claimant's compensable disability in the light of his refusal to submit to corrective surgery. In a carefully prepared and excellently reasoned opinion the commission first expressed the view that Morrison's refusal to undergo an operation upon his back was not unreasonable, within the terms of the statute. We quote pertinent parts of the commission's opinion, with the preliminary observation that we find its statements of fact to be supported by substantial evidence:

From this brief review of the evidence including the testimony of claimant himself and of the doctors who examined him, it is apparent that without surgery claimant is permanently and close to totally disabled within the meaning of the Arkansas Workmen's Compensation Law. Claimant himself testified that he is unable to work and ... Dr. Christian, in effect, agreed with him.

It is strongly insisted, however, by respondents that through successful excision of the disc material and a successful spinal fusion, claimant's disability would be greatly diminished, and that because of his refusal to submit to such surgery, he

should not be given a disability rating greater than 15 per cent to the body as a whole. This leads us to a more careful consideration of the evidence with respect to such surgery. It is true that all three of the doctors strongly advise such surgery; but it is equally true that they are not so certain or positive as to the outcome of such surgery. For example, in his deposition, Dr. Watson was asked how much, in his opinion, surgery would improve claimant's condition. He answered, "We are dealing with speculation. I might think that I had done a good job on him, a technically good job, and I might feel that his bona fide demonstrable physical residual disabilities were very minor. But what his attitude might be afterwards, I do not know."

Also, Dr. Fletcher, in his deposition, while strongly urging surgery, testified that it would have been his objective with claimant, had he performed the operation, to return him to gainful employment. But, following this same testimony, he further testified in answer to the question whether he would assume that it was probable that such would be the results, "You could probably tell at the time of surgery, as to the degree of involvement and particularly the disc next to it and *I think it might be determined by the findings at the time of surgery, probably, whether he could or couldn't return*".

In fact, respondents, on Page 7 of their brief filed with the Commission, frankly state: "That is, no one—not even the examining doctors—could say with any degree of certainty what the claimant's possibility of returning to work following an operation would be."

Our Statute, *Ark. Stats.* § 81-1311, provides that where an injured person unreasonably refuses to submit to a surgical operation which has been advised by at least two qualified physicians and

where such recommended operation does not reasonably involve risk of life or additional serious physical impairment, the Commission may, in fixing the amount of compensation, take into consideration such refusal to submit to the advised operation. Respondents have asked us to construe this provision of our workmen's compensation law to mean that in the present case claimant is not entitled to an award for any disability in excess of 15% to the body as a whole.

For at least two reasons we are unable to agree with respondents in this contention.

The first of these reasons is that we do not consider that this provision of our law should be construed as being so highly penal as to deprive in all cases an injured workman of the small compensation benefits to which the law otherwise entitles him. We must bear in mind that our statute, which is to be liberally construed in favor of the injured employee, does not itself make it mandatory that a claimant undergo a surgical operation, even upon the advice of qualified physicians, but leaves it permissive for the commission to consider such fact in fixing the amount of compensation. The statute does not require that the commission *shall* take such refusal into consideration, but uses the permissive term *may*. The only time when the commission may take such refusal into consideration is when the injured person *unreasonably* refuses to submit to such surgery. When can it be said that an injured person has unreasonably refused to submit to the operation? It would appear to us that we must weigh the obvious possible involvement of additional serious physical impairment, and the discomfort and inconvenience to claimant, as well as the additional cost to respondents, against the benefits to be gained from such operation. It is not only a question of whether the operation would rea-

sonably involve additional physical impairment, but does it hold out probable promise of improvement? It is admitted by one of the witnesses, Dr. Watson, that there are instances of disastrous results from any kind of surgery due to many factors beyond the physical control and "it is possible that such could happen in any given case." As to the favorable results to be obtained from such operation, it was the opinion of both Dr. Watson and Dr. Fletcher that this would have to await the operation itself and that pending the operation, it was problematical or speculative in this case as to whether claimant would be benefited.

It was the opinion of the doctors testifying on the question that claimant's fears were honest and genuine. It was also their opinion that this honest and genuine fear could influence the results insofar as this claimant is concerned, even though the operation might be a technical success when judged by surgical standards. In view of all these factors and considerations, we are unwilling to say that claimant's refusal to submit to surgery was unreasonable within the meaning of our law.

Thus it will be seen that the commission first reached at least a tentative conclusion that Morrison's refusal to submit to an operation was not unreasonable, within the meaning of the statute. Although we might end our review of the case at this point, we are not quite satisfied to do so, because the commission then went on to base its ultimate conclusion upon the assumption that Morrison's distaste for surgery was unreasonable. This excerpt from the opinion of the commission makes its position clear:

But even if we should say that claimant's refusal to undergo surgery was, under all the circumstances, unreasonable, this does not mean that under the statute we should arbitrarily say that his

permanent partial disability does not exceed 15% to the body as a whole. To hold this we would have to be arbitrary for the simple reason that the statute itself does not enjoin this duty upon us. It merely provides that we may take such refusal into consideration. Without making it mandatory that we do so, it permits or authorizes us, if in our judgment the facts warrant or justify, to take this into consideration and to give to it such weight as we feel from a consideration of all the facts and circumstances should be given to it.

Furthermore, to agree with the contention of respondents that claimant should be given a permanent partial disability rating not to exceed 15% to the body as a whole based upon the testimony of respondents' medical witnesses in the case would be to confuse the terms, "permanent impairment" and "permanent disability," and would be to misconstrue the role and scope of medical responsibility in the evaluation of permanent disability. Permanent impairment, which is usually a medical condition, is any permanent functional or anatomical loss remaining after the healing period has been reached. While permanent impairment is always an important consideration in the evaluation of permanent disability, yet it is only a contributing factor and is not the sole thing to be considered. Permanent disability means incapacity because of injury, or permanent impairment, to earn, in the same or any other employment, the wages which the employee was receiving at the time of the injury. It is based upon an injury or permanent impairment which is usually a medical condition, but it is also affected by non-medical factors such as age, education, occupational skills and training, and the economic environment. The American Medical Association in its "Guides to the Evaluation of Permanent Impairment to the Extremities and Back" points out in the preface the important distinction between

permanent impairment on the one hand and permanent disability on the other hand. It is there stated that the physicians' role in the evaluation of permanent disability is limited in its scope to the evaluation of permanent impairment or an appraisal of the nature and extent of the patient's illness or injury. It is further pointed out that the evaluation of permanent disability, which is an appraisal of the patient's present and probable future ability to engage in gainful activity, is an administrative and not a medical responsibility and function. See Special Edition of the Journal of the American Medical Association, Second Printing 1965, on "Guides to the Evaluation of Permanent Impairment to the Extremities and Back."

It is not the role or function of a doctor to state what a claimant's permanent disability is, as that term is defined in our law; but his role and the scope of his duty are to evaluate permanent impairment.

It may well be that a person has a permanent physical impairment of say 15%; yet because of age, education, training, experience and skills may have a much greater disability when measured in terms of diminished capacity to work and earn wages.

We, therefore, are of the opinion that respondents' contention, that because of claimant's refusal to undergo surgery he should be given a disability rating of not to exceed 15% to the body as a whole, is without merit. It was the opinion of at least two of the doctors testifying in this case that without surgery claimant is totally disabled. Claimant himself states that he is unable to perform any kind of gainful employment. The referee, after a consideration of claimant's age, his lack of education, his absence of vocational training or skill, and his physical impairment, came to the conclusion that

claimant suffers a permanent partial disability of 60% to the body as a whole. We are of the opinion that this finding is supported by a preponderance of the evidence and that the award of the referee should be, and is hereby, affirmed.

In commenting upon the commission's reasoning we think it appropriate to make two observations. First, we share with other courts a genuine reluctance to disturb the findings of the commission upon a matter that lies especially within the discretion of that tribunal. Larson has summarized the cases:

The problem of unreasonableness of refusal, and of weighing risk against probable benefit is encountered in its most acute form when the treatment takes the form of surgery. If the risk is insubstantial and the probability of cure high, refusal will result in a termination of benefits. But if there is a real risk involved, and particularly if there is a considerable chance that the operation will result in no improvement or even perhaps in a worsening of the condition, the claimant cannot be forced to run the risk at peril of losing his statutory compensation rights. In the commonest operations presenting this problem—hernia, intervertebral disc, and amputation—most courts will not at present disturb a finding that refusal to submit to the operation is reasonable, since the question is a complex fact judgment involving a multitude of variables, including claimant's age and physical condition, his previous surgical experience, the ratio of deaths from the operation, the percentage of cures, and many others. The matter cannot be determined automatically as a matter of medical statistics and expert testimony. The surgeon who sees several operations every day and who testifies that the chance of fatality is only 5 percent naturally has a different point of view than the claimant who has never had a major operation and might quite und-

erstandably prefer to enjoy life as best he can with his injury rather than take a one-in-twenty chance of being dead. [Larson, Workmen's Compensation, § 13.22 (1968).]

Secondly, we are firmly of the view that the commission did not exceed its authority in fixing the claimant's award at a 60% permanent partial disability. It is true that the witnesses, including the claimant himself, estimated his disability as being at one or the other of two extremes: Either a 100% disability or a 20% disability. It is fair to say that there is no direct evidence fixing his disability, either functional or economic as we have heretofore explained those terms, at any percentage between the extremes of 100% and 20%. Nevertheless, we uphold the commission's award of a 60% permanent partial disability.

Our reasoning is simple. The statute declares that when the claimant unreasonably refuses to submit to surgery the Commission *may, in fixing the amount of compensation,* take into consideration such refusal to submit to the advised operation. Ark. Stat. Ann. § 81-1311. We think the legislature, in saying that the commission "may" take the refusal into consideration chose its words with care. The intangible elements entering into the decision are many as both the commission and Larson *supra* have pointed out. In view of such considerations we are of the opinion that the commission acted within its delegated authority in choosing a middle ground between the extremes of 100% disability and 20% disability.

If that is not a correct interpretation of the statute, then we are at a loss to understand what it really means. When the claimant's refusal to submit to surgery is *reasonable,* there is no problem. It is only when the refusal is *unreasonable* that the commission's discretion comes into play. If the commission is absolutely bound by the opinion of the respondents' doctors, that the

operation promises a fair degree of success and involves only a slight risk, then the discretion lies with the doctors and not with the commission. That is not what the statute says. We do not think that is what it means. No doubt cases might arise involving an abuse of the commission's wide discretion in the matter, but this is not such a case.

Affirmed.

HARRIS, C.J., and JONES, J., dissent.

CARLETON HARRIS, Chief Justice. I disagree with the result reached by the majority. Doctors Robert Watson and Thomas Fletcher both estimated Morrison's permanent partial disability at 20%. Dr. Watson, in his final report, stated that, if the estimate of disability were based upon Morrison's own statement, and upon actions strictly under Morrison's own emotional control, claimant would, presently, be considered totally disabled. He further stated, however, that an estimate of disability based on findings that can be substantiated by neurological examination would be more in the field of 20% permanent partial disability. This opinion by these doctors was a rating of disability *without surgery*. With surgery, all doctors, including Dr. Christian, were of the opinion that the permanent partial disability would be even less. The only evidence I find to the effect that there was total disability without prospects of any improvement, was that of the claimant himself, a man with no medical knowledge, and apparently prejudiced against doctors. Dr. Christian did state that, as of the time of the examination, Morrison was totally disabled; however, he added:

"* * * I would anticipate with successful disc excision and spine fusion to have reduced his disability to partial permanent disability of an estimated 15 to 20% of the body as a whole."

Of course, no doctor can guarantee results from an operation, but it is clear that all were of the opinion that surgery would be beneficial. Doctors Watson and Fletcher both considered claimant's refusal to have surgery to be unreasonable, and while Doctor Christian did not use those particular words, it is apparent from the record that he too holds the same view. Morrison was adamant on the subject of an operation, and said that he wouldn't submit to surgery if "a million" doctors recommended it. Claimant testified that he was told by the doctors that there was a possibility that he might lose the use of his legs, if he had the operation. However, no doctor testified to that effect. It is apparent that Morrison does not have much use for the medical profession, and his refusal to submit to the operation is somewhat predicated on that fact. When asked why he felt that the doctors recommended surgery, he replied:

"Well, they are getting paid for it. They just operate on your back and then say, Mr. Morrison, we have done all we could for you. They might do their best but they already said some do and some don't. That was plain enough for me."

Dr. Watson commented on the proposed operation, as follows:

"It is looked upon as being a simple task that one of us might do once or twice a day, or maybe do several of them a week. Time has proved it is a perfectly safe procedure. The muscles at the back are split in a longitudinal fashion, so that they are retracted away from the backbone. There is a little ligament that runs from one lamina, which is the back of a vertebra up to the next lamina, covers an area about the size of the ball of a man's thumb. One can remove this little piece of ligament and give an opening about the size of the ball of a man's thumb, and through this we work to retract the

nerve root and to take out these pieces of fragmented disc. Sometimes the evidence of surgery is so scant that it cannot be recognized by x-ray. And as far as time of operation, it can be from thirty minutes to an hour and a half.

"As far as being bedridden, we let them out of bed to go to the bathroom the next day if they want to. We customarily send them home from the hospital from five to seven days. Rarely more than seven days after surgery. Their intervals for healing depend considerably on the type of work they do and their own personalities. Some people anxiously want to return to work too soon. Maybe in a matter of four weeks, six weeks. Some are very hesitant about ever wanting to return to work.

"I have so much faith in this I've done this surgery on personal friends, on hunting companions, on business acquaintances, and on other doctors that we are associated with."

The majority say, "If the commission is absolutely bound by the opinion of the respondents' doctors that the operation promises a fair degree of success, and involves only a slight risk, then the discretion lies with the doctors and not with the commission. That is not what the statute says." I agree that the discretion lies with the commission, but where all the medical proof is in accord, i.e., all agree that the operation involves but little, if any, risk to the patient, it seems to me that the ruling was arbitrary. Had there been medical evidence also offered that the operation was dangerous, and would result in only slight benefits to the patient's condition, then a fact question would have been presented. But when the opinions of outstanding specialists are contradicted only by the statement of the claimant, I can see no justification for awarding 60% permanent partial disability to the body as a whole.

It is my view that Morrison's refusal to submit to the operation was completely unreasonable, and entirely

unsupported by substantial evidence that such an operation might aggravate or worsen his condition.

I would reverse.

J. FRED JONES, Justice.    I do not agree with the majority opinion in this case.    All the doctors who have examined the appellee agree that he has a rupturtd disc and is in need of surgical removal of the disc material for relief of pain, and is in need of spinal fusion for stability of the spinal column.    None of the doctors say that appellee is able to do any kind of work in his present condition and the appellee says that he is not.    The final medical estimates of functional disability leave little incentive for the appellee to accept the proposed surgery.

Dr. Christian reported, on May 5, 1966, as follows:

"This patient has a herniated disc and I think quite likely a ruptured disc with nerve root compression on the right side.    He has x-ray evidence of almost complete collapse of the lumbosacral disc of long duration.    His current disc trouble may be at that same level but I would think more likely from the level above.    In any event, he has had back and severe leg pain for a month and has not responded to conservative treatment.

I have recommended to him that he be hospitalized and that a lumbar myelogram be carried out to confirm the diagnosis of the disc protrusion and to determine the level at which it has occurred and that this be followed by surgical excision of the disc.    A man who does the type of work that he does, I should think, should have a fusion of the involved joint at the time of the disc excision and if the disc protrusion is at L-4, 5 the fusion should be extended to include the lumbosacral joint."

After the disc lesion was confirmed on myelogram and the appellee had refused the recommended and tendered

surgery, Dr. Christian, on May 18, 1966, reported as follows:

"Since he refuses surgical treatment and this is what I think he should have I have no alternative except to release him from care. He is, as of this time, totally disabled. I would anticipate with successful disc excision and spine fusion to have reduced his disability to partial permanent disability of an estimated 15 to 20% of the body as a whole."

Dr. Robert Watson reported on July 8, 1966, as follows:

"I have been furnished with a copy of Dr. Christian's letter of May 18, 1966, describing the myelographic studies as showing a likely ruptured intervertebral disc at the lumbosacral interspace on the right, and, to me, this man's present physical picture would certainly indicate such.

This man, seemingly, has been seriously disabled for an interval now of four months' time, and I do not see much hope for any spontaneous recovery. In my opinion, this man should be operated upon.

\* \* \*

... I agree with Dr. Christian that should this man cooperate and have surgery, likely then his disability could be reduced to an estimated 15 to 20 per cent affecting the body as a whole."

On January 24, 1967, Dr. Watson reported as follows:

"My last report to you regarding this man was dated July 8, 1966. In that report, I stated to you that, based on my neurological examination and the

report of Dr. Christian's myelographic studies, this man did have a ruptured lumbar disc and should be operated upon. Also, in my report to you at that time, I stated this man was very firmly opposed to the thought of surgery.

I have since seen and examined this man at your request in our office on January 23, 1967. Now this man enters the office on crutches. He tells me his condition is not appreciably changed over that when I saw and examined him last summer. Again, when I discussed surgery with him, he firmly refused it.

\* \* \*

If one based an estimate of disability strictly upon this patient's own statement and upon the actions strictly under his own emotional control, one would then say this man was, at this time, totally disabled. However, if one bases evidences of disability on bona fide findings that can be substantiated by neurological examination, the estimate of disability is much less, and more in the field of 15 per cent affecting the body as a whole. Actually, I feel that much of this man's so-called 'disability' is under his own emotional control.

This man refuses surgery, and with his emotional makeup, one can speculate as to what sort of subjective benefit he might obtain following surgery. I feel it would be perfectly fair to the man to estimate his present permanent residual disability as being 15 per cent affecting the body as a whole, and set this present time as the interval for maximum healing. By doing so, we will give him almost a full year's interval for healing.''

There is no question, according to the record in this case, that the appellee has a herniated or a ruptured

disc, and there is no question that he needs surgery. The medical reports, however, are somewhat confusing. Dr. Watson first agreed with Dr. Christian, that appellee's total disability could be reduced to 15 or 20% by surgery, and Dr. Watson did not see much hope for any spontaneous recovery. After appellee finally and unequivocally refused to have surgery, Dr. Watson found that much of the "so-called disability" was under the appellee's emotional control and he estimated appellee's true permanent partial disability to be 15% affecting the body as a whole.

The appellee had a perfect right to refuse the proposed surgery, but with the risk of statutory penalty to be assessed by the Commission if he unreasonably did so. Under Ark. Stat. Ann. § 81-1311 (Repl. 1960) pertaining to medical and hospital services and supplies, is found the following:

> "... [W]here an injured person unreasonably refuses to submit to a surgical operation which has been advised by at least two [2] qualified physicians and where such recommended operation does not reasonably involve risk of life or additional serious physical impairment the Commission may, in fixing the amount of compensation, take into consideration such refusal to submit to the advised operation."

In my opinion there is substantial evidence that the appellee was totally disabled for employment when he was last seen by Dr. Watson. He was on crutches, said he was about the same as when last seen and this would confirm Dr. Watson's previous opinion that he saw little hope for any spontaneous recovery. No witness has indicated that the appellee is not totally disabled from performing gainful employment in his present condition without surgery. It has almost become a matter of common knowledge that a truly ruptured disc does not heal spontaneously and that a person who has suffered

one is more likely to wind up in a wheel chair without surgery than he is if he has surgery. In such a situation, when does such disability become permanent?

Arkansas Statutes Annotated § 81-1313 (Repl. 1960) provides as follows:

"The money allowance payable to an injured employee for disability shall be as follows:

(a) Total Disability: In case of *total disability* there shall be paid to the injured employee during the continuance of such total disability sixty-five per centum [65%] of his average weekly wages. Loss of both hands, or both arms, or both legs, or both eyes, or of any two [2] thereof shall, in the absence of clear and convincing proof to the contrary, constitute permanent total disability. *In all other cases, permanent total disability shall be determined in accordance with the facts.*

(b) Temporary partial disability: *In case of temporary partial disability resulting in the decrease of the injured employee's average weekly wage, there shall be paid to the employee sixty-five per centum [65%] of the difference between the employee's average weekly wage prior to the accident and his wage earning capacity after the injury.*

(c) Scheduled permanent injuries: An employee who sustains a *permanent injury* scheduled in this subsection shall receive, in addition to compensation for the healing period, sixty-five per centum [65%] of his average weekly wage for that period of time set out in the following schedule:

(1) Arm amputated at the elbow, or between the elbow and shoulder, two hundred [200] weeks;

\* \* \*

(22)   Partial loss or partial loss of use:   Compensation for *permanent partial loss or loss of use of a* member shall be for the proportionate loss or loss of use of the member.

(d)   Other cases:  *A permanent partial disability not scheduled in subsection* (c) *hereof shall be apportioned to the body as a whole* which shall have a value of 450 weeks, and there shall be paid compensation to the injured employee for the proportionate loss of use of the body as a whole resulting from the injury. * * *''   (Emphasis supplied.)

I only differ with the Commission and the majority opinion as to the extent and permanency of appellee's disability in this case.    There is substantial evidence that appellee is totally disabled for gainful employment at the present time, but there is no evidence that this disability will be permanent.    While appellee's refusal to have surgery may have been unreasonable at the time he first refused, it would appear to be more reasonable now if he does only have 15% permanent partial disability in his present condition without surgery and can, at best, anticipate a 15 to 20% permanent partial disability following surgery.    I am convinced that much of the difficulty arising from the use of medical reports in evidence in compensation cases lies in a difference in terminology employed.

The statute distinguishes between *injury* and *disability*.    Injury may result only in compensable permanent loss of use of the body or any scheduled part thereof,* or injury may result in permanent total disability or temporary partial disability *in addition to,* and *including,* permanent loss of use of the body or a scheduled member.    *Glass* v. *Edens,* 233 Ark. 786, 346 S.W. 2d 685; *Wilson & Company, Inc.* v. *Christman,* 244 Ark.

---

*(Sometimes referred to as "functional loss," "functional disability," "clinical loss" or "clinical disability.")

132, 424 S.W. 2d 863; *Ray* v. *Shelnutt Nursing Home*, 246 Ark. 575, 439 S.W. 2d 41, (opinion delivered April 7, 1969).

I have concluded that some confusion in the cases has been brought about by the medical examiner, the Workmen's Compensation Commission and by this court deviating from the statutory terminology in distinguishing between permanent disability and permanent injury. In my opinion, so-called *"functional* disability" is not disability at all within the meaning of the statute, but is "partial loss or loss of use" within the scheduled injury section of the statute.

The statute itself is somewhat ambiguous and confusing. The statute is clear on total disability, permanent total disability and temporary partial disability. It is also clear on twenty separately numbered scheduled permanent injuries. The statute then provides in separate numbered paragraphs (21) and (22) for "total loss of use" and for "partial loss or partial loss of use" of the members of the body designated under the twenty scheduled injuries. In recognition of injuries to parts of the body not scheduled, the statute relates those injuries to the body as a whole under a separate subsection designated "other cases" and provides that "a permanent partial *disability* not scheduled in subsection (c) hereof shall be apportioned to the body as a whole which shall have a value of 450 weeks."

It is noted that *disability* is not what is scheduled under subsection (c). Permanent injuries, including partial loss or loss of use, are what is scheduled under subsection (c). So the phrase, "permanent partial disability," as it relates to the body as a whole under the scheduled injury section of the statute, could only mean permanent injury to the body as a whole resulting, not in total or partial loss by amputation as in the case of an arm or leg, but resulting in a permanent partial *loss of use of the body* as a whole, the same as *loss of use*

of an unamputated leg or arm. The phrase "permanent partial disability" was not inadvertently used in this section. It simply means that permanent injury resulting in a *loss of use* as it relates to the body as a whole, as well as *permanent partial disability* as it relates to the body as a whole, are both compensable and are both covered by this same section. That was the effect of our holdings in the *Edens* case and the *Christman* case, supra.

Now returning to the case at bar, the highest estimate of permanent disability is 20% to the body as a whole on a functional, or loss of use basis, and there is substantial evidence that would sustain an award in that amount. There is no evidence at all as to appellee's future earning capacity, and therefore, no evidence as to the extent of his actual *permanent disability*. If the appellee's condition becomes worse, he should have the benefit of surgery if and when he should desire surgery at any time within the statutory period of limitations. If the appellee should decide to have surgery and his *disability* is greatly reduced thereby, both the appellee and the appellant should be afforded the benefit of such procedure.

Appellee's disability may or may not become partial, and it may or may not become permanent. There is substantial evidence that would support an award of 20% and certainly an award of 15% based on the loss of use of the body as a whole, but I find no evidence that would sustain an award of *permanent disability* at all or of *temporary disability* less than total.

If the Commission was convinced that the appellee was unreasonable in refusing the operation, it is my opinion that it had a perfect right, in the exercise of its discretion, to award the appellee a 60% permanent disability if, and only if, there has been any substantial evidence that the appellee had a permanent disability greater than 60%. In my opinion the Commission

904

would have the right, in the exercise of its discretion, to order a reduction in *weekly benefits* for an unreasonable refusal to have surgery. If the Commission did award the 60% in this case on the basis of appellee's refusal of surgery, it is my opinion that the appellee was rewarded for refusing the surgery, rather than being penalized as the statute intended, for I find no evidence in the record that appellee's disability, other than the 20% in the loss of use of body function, is permanent.

I would reverse and remand to the Commission for an award of weekly compensation for temporary total disability, subject to change if it becomes partial, and subject also to the Commission's right to the exercise of its proper discretion as to the unreasonableness of appellee's refusal to have corrective surgery.