KENNETH BURROUGHS *v.* DON FORD, D/B/A
IRONWOOD STABLES ET AL

5-5383                                             460 S. W. 2d 776

Opinion delivered November 30, 1970
[Rehearing denied January 11, 1971.]

---

*William W. Green,* for appellant.

*Wootton, Land & Matthews,* for appellees.

CONLEY BYRD, Justice. The sole issue before the Workmen's Compensation Commission and the Circuit Court on appeal was the extent of the permanent partial disability to appellant Kenneth Burroughs's left foot. The Commission allowed a 50% permanent partial disability. The circuit court reversed the Commission and held that there was no evidence to sustain a permanent partial disability in excess of the 10% functional disability assigned by Dr. Thomas M. Durham. The matter is here upon the same issue.

At the hearing before the referee, appellee Don Ford doing business as Ironwood Stables and Liberty Mutual Insurance Company, his carrier, took the position that appellant had only sustained a 10% partial disability to his left foot. The appellant took the position that his wage earning ability had been imparied and that his disability exceeded the functional disability assigned by Dr. Durham.

Following his injury on February 9, 1968, appellant was seen by Dr. Jack Wright on February 12, 1968. Dr. Wright recognized a tendency toward eversion of the left foot. He last saw Mr. Burroughs on May 1, 1968, and stated that Mr. Burroughs still complained of some weakness of his left ankle. Since he was unable to objectively find any abnormality he certified that Burroughs was able to return to work as of April 29, 1968.

In March or April 1968, Mr. Burroughs worked two weeks for Turf Catering Company at the Hot Springs race track as a bartender. During July 1968 through December 1968, he worked at the University of Florida as a lab machinist. When that job played out he returned to Hot Springs. From February through April 1969, he again worked for Turf Catering Company at the Hot Springs race track. He worked for the same company at the Kingsland race track for 14 days terminating his

employment there on April 17, 1969. The hearing was in May of 1969. Following Dr. Wright's treatment, Mr. Burroughs was treated by Dr. Thomas M. Durham, an orthopedic surgeon in Hot Springs and while at the University of Florida he was treated by Dr. Edward B. Kissam. Upon his return to Hot Springs he was again seen by Dr. Durham.

Dr. Durham's report of September 23, 1968, is as follows:

"The above-named patient was followed in our office from May 31, through July 6, in regard to further treatment for the injury to his left ankle, sustained February 9, 1968. We were provided with Doctor Jack Wright's reports and the patient confirmed details of the history. Mr. Burroughs told us he had been released by Doctor Wright approximately three weeks prior to our examination.

Our examination revealed a large heavily muscular man. Examination was negative except for the left ankle, which showed enlargement of approximately 3/4 inch as compared with the right ankle. Most of the tenderness elicited, was over the course of the anterior and posterior tibial tendon. There was no limitation of motion in the ankle and no bony deformity.

X-rays were negative for evidences of bony injury, and previous X-ray were reported to be of the same character. My recommendations at this time were: (1) Toe walking and inversion exercises to help strengthen the posterior tibial muscles (2) Hot soaks several times daily (3) Aspirin, grs. 15, four times a day.

Mr. Burroughs was again seen September 30, 1968, and it was felt at this time that he was a little more stable, particularly when going up on his toes. He was continued on the aspirin, hot soaks and exercises, and at his last visit on December 17, 1968,

the patient felt that his foot and ankle were stronger. However, he continued to have some pain mostly at night and had a little swelling. He mentioned that he had lost forty pounds in the last few months.

Examination at this time revealed that he still pronated considerably with the left foot but he could correct this actively, and also this corrected when he went on tip toe. The patient had tried using some shoes without the heel wedge and arch support and these had seriously run over medially.

Mr. Burroughs was advised to continue his exercise and also the shoe corrections on his left shoe. For a prognosis I feel that he will have some permanent residual weakness in his left foot from the stretching injury to the posterior tibial tendon. It is still causing some pain after much activity and also it requires support with a built up shoe. It is possible that progressive exercise of the muscle will help compensate for this stretching of the tendon, but if the patient continues to have this difficulty, and particularly if it gets worse, I feel that he might benefit from distal transplantation of the posterior tibial tendon.

Mr. Burroughs is now moving back to Hot Springs, Arkansas, and he will contact Dr. Durham for further follow up there."

Dr. Durham's final report under date of April 7, 1969, is as follows:

"The patient returned to our office on January 29, and was seen that date and March 11, 1969.

The patient has lost approximately 50 pounds in weight and examination and comparison of the lower extremities is somewhat more significant now that he has lost this amount of weight.

There remains a definite increase in pronation of

the left foot as compared with the right, as well as some tenderness under the medial end of the navicular bone. There is slight fullness and definite tenderness along the course of the posterior tibial tendon.

I would agree with Doctor Kissam's evaluation of January 11, 1969, in that I feel that this patient has a chronic posterior tibial tendon tenosynovitis and I would feel that there is some permanent injury to the left foot as a result of this.

We changed his shoe support, gave him medication to reduce the inflammatory reaction to the posterior and anterior tibial tendon and put him on a moderate activity program. By June 14, there was no longer any swelling present, though the patient still had slight discomfort in the course of his posterior tibial tendon. It was felt that the appearance of the left foot and ankle had returned to normal as of that time. Further slight change was made in his shoe correction and on July 6, we saw this patient for the last time, indicating that on the basis of examination we could find no significant residual present and felt that the healing period had ended.

If we can be of further service in this matter, please advise us. We are forwarding a copy of this report to Liberty Mutual together with a copy of our statement."

Doctor Kissam's report under date of January 11, 1969, is as follows:

"Mr. Burroughs was examined in my office on August 26, 1968, at which time he stated that he had injured his left ankle when he turned it while walking a race horse in Hot Springs, Arkansas, on February 12, 1968. As you are aware, he was treated first by Dr. Jack Wright and later by Dr. Thomas M. Durham, and according to a copy of report from Dr. Durham to you, dated September 23, 1968,

it was felt that Mr. Burroughs had healed without any residual except some complaint of pain. However, Mr. Burroughs still complained of some pain in his ankle and a tendency for it to turn in.

Physical examination directed primarily to the left foot, revealed that in the weight bearing position, Mr. Burroughs had a rather marked pronation of his left foot compared to the right. There was tenderness at the insertion of the posterior tibial tendon and also along the course of the tendon to the medial malleolus and slightly posteriorly. There was slight tenderness also anteriorly to the medial malleolus. Ankle motion, passively and actively, was within normal limits. There was no swelling present and the general contour of the foot appeared normal. When the patient attempted to stand on tip toe there appeared to be some weakness and tendency for his ankle to evert. It was noted that the patient had a 1/8 inch medical heel wedge in his left shoe and also an arch support.

My clinical impression was that this patient had had an eversion strain of the left foot and ankle with stretching injury of the posterior tibial tendon and probably a moderate sprain of the anterior talofibular ligament. I feel that his residual pronation is the result of this stretching injury to the posterior tibial tendon.

We pointed out to the patient that if symptoms are not well-controlled with shoe corrections, it may be necessary to surgically explore the posterior tibial tendon. It is my opinion that there is a permanent partial disability of 10% of the left foot."

The testimony shows that Mr. Burroughs is 46 years of age and at the time of the hearing weighed in excess of 240 pounds. Prior to World War II, he was a farmer. During World War II he served in the U. S. Navy and thereafter worked as a rigger during the year 1947. In 1948, he returned to Hot Springs and bought

a dump truck and hauled dirt. From 1948 until 1963, he served as a first sergeant in the Air Force. From 1963 to 1964, he owned a tavern for one year. In 1964, he worked in a cabinet shop for a couple of weeks and as a maintenance man for Kings Foods Host Restaurant. While working for the latter employer he injured his back and was awarded a 23% permanent partial disability. In 1965, he worked 3 or 4 weeks as a house painter, worked for Joe Teague, installing air-conditioning and later worked for the University of Florida as a lab machinist. The latter job was building nuclear shields for experiments and was so-called "outside work".

Appellant testified that he would be unable to perform any of the jobs he had formerly held because if he was on his left leg and foot excessively, walked a lot, tried to climb or happened to overdo anything, his foot would swell up and be sore around the bone on the inside of his left foot. He described the bartender or meat cutter and sandwich man job that he did for Turf Catering Company as light work where he could sit or otherwise take the weight off of his foot during the actual running of the horse races. His job as lab machinist at the University of Florida from July to December 1968 was with persons he knew and was described by him as inside work with all heavy lifting being done by others.

Mr. Burroughs's wife testified that every time he has tried to work since his ankle was hurt, his ankle is always swollen every night and he spends a lot of time with it propped up. She observed swelling during the time he worked as a beer drawer or a sandwich meat slicer. In fact she said that it would be swollen every night. If he wasn't careful while just walking along and happened to turn his ankle or something, his foot would be sore and swollen again and would have to be kept propped up for a couple of days.

The appellees to affirm the decision of the trial court rely upon *Ray* v. *Shelnutt Nursing Home*, 246

Ark. 575, 439 S. W. 2d 41, wherein we pointed out that there was no evidence to sustain the commission's finding that the claimant's disability exceeded her functional disability. Therein lies the difference between this case and the Ray case. As we view the testimony of appellant and his wife relative to the swelling and pain that he endured in attempting to work, coupled with the doctors' recognition that it might become necessary to surgically explore the "posterior tibial tendon", it is sufficient to substantiate the commission's finding that the claimant had suffered a 50% permanent partial disability to his foot.

Reversed and remanded.

CARLETON HARRIS, C. J., dissents.