## VACCARO-GROBMEYER CO. ET AL v. WILLIAM A. McGARITY

5-5460                                             463 S. W. 2d 372

### Opinion delivered February 22, 1971

*Catlett & Henderson,* for appellants.

*Sharpe & Wilkinson,* for appellee.

J. FRED JONES, Justice. This is a workmen's compensation case in which the claimant-appellee, William A. McGarity, hereinafter called the claimant, was awarded 50% permanent partial disability to the body as a whole by the referee, and on review by the full Commission he was awarded 100% permanent disability. On appeal to the St. Francis County Circuit Court the award of the Commission was affirmed. On appeal to this court the employer, Vaccaro-Grobmeyer Co. and its

workmen's compensation insurance carrier, Casualty Reciprocal Exchange, contend that there is no substantial evidence to sustain the award and they state the point they rely on as follows:

"The award of One Hundred (100%) Per Cent permanent disability is not supported by any substantial medical evidence."

On appeals from the decisions of the Workmen's Compensation Commission, the trial court, as well as this court, only looks to the record for a determination of whether there is any substantial evidence to sustain the findings and award of the Commission and if there is, the Commission's order is affirmed. This rule has been announced so often citation would only add volume without weight to this opinion. In examining the record for substantial evidence to support an award or denial of compensation for permanent partial disability in a workmen's compensation case, the examination is directed to all the competent evidence and is not confined to the medical evidence alone. See *Wilson & Co., Inc.* v. *Christman*, 244 Ark. 132, 424 S. W. 2d 863. In the case at bar, however, we conclude that the award of the Commission was supported by substantial *medical* evidence.

The facts, as gathered from the record, are as follows: The claimant's right arm was amputated near the shoulder in 1918 when he was 13 years of age. Following the amputation of his arm, the claimant had farmed until 1933 when he became engaged in house painting. He had lost no appreciable time from work as a house painter until his injury on July 23, 1965, when he attempted to move a refrigerator from against the wall of a room he was painting; his foot slipped on a drop cloth and he twisted and injured his back.

Following his injury, the claimant was seen by his family physician, Dr. George McPhail, in Forrest City. Dr. McPhail testified that he had known the claimant for about 20 years and had been his family physician during that time. He testified that following the injury he examined and x-rayed the claimant and diagnosed

his condition as degenerative arthritis of the lumbar spine, along with disc disease. He hospitalized the claimant from July 24, 1965, to August 6, 1965, and again from September 14, 1965, to September 23, 1965, at which time claimant was discharged from the hospital free of muscle spasm and pain. He re-entered the hospital in Forrest City on two subsequent occasions and was last discharged from that hospital on January 20, 1966. On February 21, 1966, Dr. McPhail reported as follows:

"He was kept in the hospital from July 25 to August 6, 1965. The muscle spasm and pain gradually subsided and he was discharged home on August 6, 1965.

He was in the office for twenty-two (22) visits and was given out-patient treatments each time, between August 6 and September 14, 1965. He was re-admitted to Forrest Memorial Hospital on September 14, 1965, for more intensive treatment and was again discharged free of spasm and pain on September 23, 1965. Since that time he has been back in the hospital on two (2) occasions and I understand in the interim he has been hospitalized on two or more occasions in Little Rock.

In all sincerity and fairness to both the insured and the insuror, I feel that this man's sprain would have healed permanently much sooner had he not had a previous existing back injury or disease. I do feel that he has been truthful in stating that he has severe back pain, as evidenced in every examination by a severe left lower dorsal and lumbar muscle spasm."

On February 21, 1968, Dr. McPhail reported as follows:

"* * * I understand he has been in a Little Rock hospital on several occasions, because of this injury, having received surgical treatment on at least two occasions, by a Little Rock physician. I have treated him in my office on numerous occasions between each hospital stay, here and at Little Rock.

He is now wearing a back brace and a brace on his left foot. I feel he has now reached maximum benefits from any treatment, except from muscle relaxants and analgesics, which he can secure on prescription and administer to himself at home. He is 75% totally and permanently disabled to do any form of manual labor."

Dr. McPhail re-examined the claimant on November 21, 1968, and testified that the claimant's condition was worse than when he last saw him and that it was his then opinion that the claimant was totally disabled. As to his final opinion, Dr. McPhail testified as follows:

"Q. you say that because of this back condition that he now has resulted from the injury and in your opinion he is a 100% disabled?

A. Absolutely—he will never work another day and the reason that I asked him to be excused from this Courtroom because I am the man's doctor and I suppose that I will continue to treat him after this hearing. I think I know if he was here and heard it where this testimony was revealed to him he will become a bedridden invalid because our minds do play a big part in our ability or will to sort of get up and do for ourselves.

Q. Doctor, with the type of back this man has as you said resulted from the injury, how does that affect him and prohibit him and keep him from painting—what keeps him from painting like he use to—he has still got his back back there? He has still got some bones and discs and nerves back there?

A. Mr. Sharpe, he is numb from his knee down and if he got on a ladder or any place to work he might just tumble off there and kill himself besides he must experience excruciating pain on any type walking even and bending would be out of the question. Gentleman, I don't want to make my testimony too strong

but I have seen a lot of backs but that is as bad one as I ever looked at and a man still be ambulatory."

Dr. Richard M. Logue, an orthopedic specialist in Little Rock, examined the claimant on May 17, 1967, and reported, in part, as follows:

"From the history, physical examination, and review of the x-rays, it is apparent that this man has a severe involvement of his back by a *traumatic* arthritic process which, to some extent, is undoubtedly due to the alleged injury and the subsequent long involved treatment course to which he has failed to respond either to his or his treating doctor's complete satisfaction. He has some residual findings in his left lower extremity and marked limitation of motion of his low back which indicates some persistent irritation of the nerve roots existing from the levels which are noted to be markedly narrowed in the x-rays. Over and above his back complaints, he has general arthritic complaints and has been continued on anti-rheumatoid medication which although not completely eradicating his symptoms, does, according to the patient, minimize to some extent his complaints. This man, at the time of the examination, was 62 years old and I feel, from the extensiveness of the spurring which is seen in the films made at this time, that some of the marked arthritic changes certainly preceded the injury as he described it to me which occurred in July of 1965. I believe that his back condition, along with his general arthritic habitus and further with the loss of his right upper extremity, *all preclude him from a gainful occupation, at this age.* Inasmuch as two discs were removed, I am satisfied that this reflects an exaggeration of the undoubtedly pre-existing arthritis and that his present condition now represents basically an *aggravation of the pre-existing arthritis* which apparently was quite extensive. * * * I believe, therefore, that the disability appertaining to the injury allegedly sustained in 1965 is basically *an aggravation of the*

*severe and marked arthritis* of his lumbar spine and that *aggravation, in itself,* represents a disability to the body as a whole in the magnitude of 30 to 35 per cent as a whole. *I* would *specifically rate his disability, from the injury in question, at a percentile figure of 33 1/3 per cent."* (Emphasis supplied).

The claimant was hospitalized in Little Rock under the care of Dr. Samuel B. Thompson, an orthopedic specialist, and after failing to respond to conservative treatment, a ruptured intervertebral disc was surgically removed on February 4, 1966, and on March 2, 1966, Dr. Thompson reported, in part, as follows:

"On February 4, 1966, I operated on him and removed a herniated disc from the disc space between the 4th and 5th lumbar vertebra on the left. There was adhesions between the undersurface of the nerve root and the underlying fibrocartilaginous mass that bulged out of the disc space. There was a large quantity of sequestrated disc material in the disc space. The surgical procedure was unusually difficult because of the scoliosis of his spine making it very difficult to get into space.

Post-operatively he had relief of the pain in his leg but had persistent numbness and loss of power of the anterior tibial muscle. This has continued to improve in the intervening period but he has not regained the full power. We did not do a fusion on his spine because of the marked degenerative changes in the spine above. Radiographically, *the best looking joint he had in his low back was the one in which the ruptured disc was located* and I was very fearful if we fused this joint it would put additional stress on the other degenerative joints in his back and we would get him into even more trouble than he is in now." (Emphasis supplied).

On November 22, 1966, Dr. Thompson again saw the claimant and reported, in part, as follows:

"X-ray Examination: Anteroposterior, anteroposterior tilt, lateral, and oblique views of the lumbosacral spine were repeated. These films were compared with previous ones made at this office. They show the surgical defect of the lamina of the 5th lumbar vertebra. There continues to be extensive degenerative changes between the 2nd and 3rd and 4th lumbar vertebra. The changes between the 4th and 5th lumbar vertebra have become more pronounced at this time in that there is some spurring bridging from one to the other on the oblique view, which was not evident in December of 1965.

I think we have attained maximum benefit in this man. He has extensive degenerative changes in his lumbar spine. These were so extensive that I did not feel we dared carry out a fusion after removing the disc at his lumbosacral joint since actually, even with the disc removed, this was the best joint that he had in his back. He had extensive motor weakness of his left lower extremity. This has improved progressively and all of the muscles have now recovered except the anterior tibial muscle, but this makes it necessary for him to wear a dropfoot brace on unlevel surfaces. It is possible he will have to do this indefinitely.

Considering the motor impairment of his left lower extremity, the fact that he had a disc injury at the lumbosacral joint and it was necessary to remove this disc, and the fact that he had such extensive degenerative changes above this that it was not considered surgically good judgment to fuse this, *he is left with quite a bad state of disability in his back.* Considering all these factors, I would estimate a *physical impairment of 30% of the value of the body as a whole,* based on the degenerative changes in his back and the disc for which we treated him. *I do not think this can be improved by further treatment.* I think he should continue to wear his low back brace when on his feet and will probably need to continue wearing the dropfoot brace." (Emphasis supplied).

Dr. Thompson again saw the claimant on November 19, 1968, and reported, in part, as follows:

"* * * There has been relatively little change in the x-ray appearance in the intervening two year period.

I feel that this is a relatively static condition and that he has a *physical impairment* of 30% of the value of the body as a whole as a result of degenerative disc disease in his lumbosacral spine and the herniated nucleus pulposus, for which we operated on him, and that the herniated nucleus pulposus was the result of the injury in question and the degenerative disc disease of his low back was aggravated by the injury in question." (Emphasis supplied).

The claimant testified, in part, as follows:

"Q. Are you able to do anything now—are you able to walk as much as two or three blocks?

A. I couldn't walk three blocks if my life depended on it not without going down.

Q. Have you tried to go fishing and relax?

A. I have tried it but I can't take it.

Q. What do you mean you can't take it—I didn't think there was anything to fishing other than sitting there waiting for the fish to bite?

A. There is—getting in the boat—you know I just can't sit there—it is painful.

Q. Where is the pain?

A. In my back—my lower part—the upper part of my back doesn't hurt so bad—I don't notice that.

Q. Do you have any pain in your left leg?

A. Yes, sir.

Q. I thought you said it was numb -you didn't feel any pain in that?

A. It is numb and it is painful.

      \*   \*   \*

Q. Can you go to the grocery store?

A. Yes, sir but I can't carry nothing.

Q. You don't carry any groceries home?

A. No, sir.

Q. Do you help your wife clean up the house any?

A. No, sir very little—I drive my truck to the grocery store—my wife goes in and get the groceries and brings them out—I set in the truck."

It is obvious in this case that the claimant had considerable osteoarthritis in his entire spine prior to his injury. It is also clear from the evidence that he sustained a ruptured intervertebral disc at the soundest disc space in his entire spine. There is no evidence that the claimant suffered any disability because of his arthritic condition prior to his injury. As a matter of fact, there is no evidence that he ever knew he had arthritis prior to his injury. It is apparent that Dr. Thompson very earnestly attempted to segregate the disability caused by the ruptured disc and the arthritis which was aggravated by, and at the location of, the ruptured disc, from the arthritis in the rest of the claimant's spine in estimating that the claimant has a 30% "impairment to his body as a whole."

Dr. Logue also attempted to segregate the aggravation by the ruptured disc from the claimant's overall disability as a result of his ruptured disc, but Dr. Logue went further in stating, "I believe that his back condition, along with his general arthritic habitus and further with the loss of his right upper extremity, all preclude him from a gainful occupation, at this age." None of the doctors, with the exception of Dr. McPhail, knew what effect, if any, the arthritis had on the claimant prior to his injury. There is no question that Dr. McPhail was of the opinion that the claimant is totally disabled because of the ruptured disc and the resulting aggravation of arthritis of the spine.

It is apparent from the record before us, that the claimant suffered no *disability* from his arthritis prior to his injury, notwithstanding Dr. Thompson's opinion that the rupture was to the best disc he had in his entire spine. As a result of the rupture of the best disc he had, he has constant pain, numbness and pain in his left leg with attending ankle drop; is unable to walk any distance and is unable to carry anything.

The compensation law allows no credit for non-disabling pre-existing conditions in determining the extent of permanent partial disability caused by accidental injury which aggravates the pre-existing condition into disability. *Hamilton* v. *Kelley-Nelson Const. Co.,* 228 Ark. 612, 309 S. W. 2d 323; *J. H. Williams & Sons, Inc.* v. *Moore,* 206 Ark. 766, 177 S. W. 2d 761. (But, see *Davis* v. *Stearns-Rogers Const. Co.,* 248 Ark. 344, 451 S. W. 2d 469).

The referee found that the claimant had a 50% permanent partial disability to his body as a whole as a result of his injury, and certainly there was substantial evidence to support that finding if that had been the question presented on this appeal. From the same evidence, however, the full Commission found that the claimant's disability amounted to 100%, so the question before us is whether there is any substantial evidence to support the finding and award of the full Commission, and we find that there was. We are not unmindful

of our decision in *Ray* v. *Shelnutt Nursing Home*, 246 Ark. 575, 439 S. W. 2d 41, but in that case the medical evidence was limited to functional disability and there was no evidence of disability beyond the functional disability found and testified to by the doctors. In the case at bar there is substantial evidence from the doctors' testimony and reports, as well as the claimant's own testimony that he is totally disabled. In *Shelnutt,* the claimant was found by the doctors, as well as by the referee, to be an excellent candidate for rehabilitation. In the case at bar, no such optimism was expressed by anyone and the substance of the medical views was to the contrary.

The judgment is affirmed.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I concur because I feel that there is substantial evidence, other than medical evidence, to support the award. I agree with appellants that it is not supported by substantial medical evidence, but this is not fatal under the rule announced in *Glass* v. *Edens,* 233 Ark. 786, 346 S. W. 2d 685, if there is, in addition to medical evidence, sufficient evidence of such matters as age, education, experience and other matters affecting wage loss to support the award.